IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

PAUL R. CASTONGUAY,          )
                             )
            Plaintiff,       )
                             )
        v.                   )          1:11CV682
                             )
LONG TERM CARE MANAGEMENT     )
SERVICES, LLC; LIBERTY COMMONS )
NURSING AND REHABILITATION    )
CENTER OF LEE COUNTY, LLC;     )
CASSANDRA STEPHENS; and LINDA  )
ANDREWS,                      )
                             )
            Defendants.      )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

Before the court in this employment action are motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure filed by all Defendants. Defendants Long Term Care Management Services, LLC ("Long Term Care") and Liberty Commons Nursing and Rehabilitation Center of Lee County, LLC ("Liberty Commons") (collectively the "corporate Defendants") move for summary judgment on Plaintiff Paul R. Castonguay's claims of sex discrimination, retaliation, and hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), as well as his state law claims of intentional infliction of emotional distress ("IIED") and negligent infliction of emotional distress ("NIED"). (Doc. 44.) Defendants Linda Andrews and Cassandra

Stephens (the "individual Defendants") move for summary judgment on Castonguay's IIED and NIED claims against them. (Doc. 42.) Castonguay opposes the motions. (Docs. 46, 47.) For the reasons set forth below, Defendants' motions for summary judgment will be granted.

## I.   BACKGROUND

The relevant facts, considered in the light most favorable to Castonguay, are as follows:

### A.   The Parties

Liberty Commons, a subsidiary of Long Term Care, is a healthcare services facility that provides patient care, including rehabilitation, long term care, respite care, and outpatient therapy. (Doc. 43-2 ("Andrews Decl.") ¶ 3.) On February 16, 2007, Liberty Commons hired Castonguay for the position of Maintenance Director. (Id. ¶ 5.) Castonguay's duties included assuring the overall maintenance of the facility, servicing equipment, performing minor repairs, and generally keeping the facility free of hazards. (Doc. 46-2 at 2-3.) One of his primary responsibilities was to maintain the safety of the grounds and facility in the event of a snowfall. (Castonguay Dep. I at 138-40.)[1]  This often required him to

_____

[1] Castonguay's deposition, which was taken in two volumes, will be referred to as "Castonguay Dep. I" (located at Docs. 43-4 and 46-11) and "Castonguay Dep. II" (located at Docs. 43-3 and 46-12).

report to work early to prevent possible accidents at the facility. (Id.) Defendant Andrews held the position of Administrator at Liberty Commons beginning July 8, 2008 (Andrews Decl. ¶ 2; Andrews Dep. at 21),[2] and was Castonguay's direct supervisor (Andrews Dep. at 14). Defendant Stephens was the Director of Nursing at Liberty Commons and also acted as supervisor to the entire staff, including Castonguay, in Andrews' absence. (Id. at 13-14.)

**B.    The Alleged Harassment**

Castonguay submits that beginning in the spring or summer of 2009 he was subjected to several unwelcome acts and comments of a sexual nature by Stephens and Laurie Williamson (who, according to one of Castonguay's response briefs, was "an Administrator from the Whiteville facility [who] occasionally visited Liberty Commons") (Doc. 47 at 5), and that Andrews condoned the conduct and failed to take the necessary actions to thwart the harassment. He particularly relies on the specific instances described below, some of which are corroborated by his co-worker Jack Vestal and by Cynthia Leslie, a department head at Liberty Commons. (See id. at 13-14; Doc. 46 at 2-3; Castonguay Dep. II at 30.)

---

[2] Andrews' deposition appears at Docs. 43-14 and 46-13 and will be referred to as "Andrews Dep."

Castonguay first relies on several comments made by Stephens that he believes were inappropriate. He testified in his deposition[3] that during a meeting, several women including Andrews and Stephens were discussing bra sizes on the opposite end of the room. (Castonguay Dep. II at 226; Castonguay Dep. I at 31; Leslie Dep. at 131.)[4] According to Leslie, this occurred in the spring of 2009. (Leslie Dep. at 129-30.) During this conversation, Stephens asked Castonguay what bra size Castonguay's girlfriend wore. Castonguay did not respond. (Castonguay Dep. I at 31; Leslie Dep. at 132.) Castonguay believed this comment was inappropriate and he felt embarrassed and humiliated, but he did not inform either Andrews or Stephens that he felt this way. (Castonguay Dep. II at 226-27.)

In a separate incident at around the same time, Stephens asked Castonguay to state his address, to which Castonguay responded "69 Echo Lane." (Id. at 224; Leslie Dep. at 129-30.) Stephens then turned around and asked Andrews if she knew what "69 means," and when Andrews said she did not, Stephens said that it was "something to do with sex" and that she would

_____

[3] Castonguay was deposed over two days but has filed a declaration in response to Defendants' motions for summary judgment. (Doc. 46-15 ("Castonguay Decl.").) The court declines to consider the declaration to the extent it contradicts the prior deposition testimony. See Barwick v. Celotex Corp., 736 F.2d 946, 959-60 (4th Cir. 1984).

[4] Cynthia Leslie's deposition is located at Docs. 43-20 and 46-10 and will be referred to as "Leslie Dep."

explain later. (Castonguay Dep. II at 224-25; Castonguay Dep. I at 233.) In June 2009, Stephens told Castonguay, "look at that" and, "don't that ass look good," referring to Andrews' buttocks. (Leslie Dep. at 134-35). Castonguay shook his head while Stephens laughed. (Id. at 135.) After making sure that there was nothing work-related that he needed to do, he left the room. (Id.) Stephens also subjected Castonguay to numerous and continuous comments – though Castonguay would not commit to an exact number in his deposition - about his buttocks, insinuating that it looked good in jeans, while Andrews observed and failed to correct the behavior. (Castonguay Dep. II at 230-31.)

Castonguay testified that he was paged to Stephens' office sometime in the late summer of 2009 for the sole purpose of viewing an image of four bare-breasted women on Stephens' computer screen. (Castonguay Dep. I at 222-23.) When Castonguay entered Stephens' office, Andrews was sitting in front of Stephens' desk. (Id. at 222.) Stephens told Castonguay to come behind the desk and look at the computer screen, then asked him which one of the women looked like his girlfriend. (Id. at 223.) Though Andrews could not see the computer screen, Castonguay surmised by her lack of reaction to Stephens' question that she already knew what was on the screen. (Castonguay Dep. II at 76-77.) Castonguay responded: "I ain't answering this. I'm not answering[,]" and left the office.

(Castonguay Dep. I at 223.)  Vestal testified that Stephens showed him the same picture on her computer while Castonguay was in the office.  (Vestal Dep. at 71.)[5]  Vestal found the picture to be unprofessional but not offensive.  (Id. at 121.)[6]

Castonguay also relies upon several incidents involving Williamson.  Castonguay testified that upon one of Williamson's visits to Liberty Commons in the summer of 2009, she flipped a mannequin/dummy upside down, briefly exposed its buttocks for Castonguay to see while saying, "hey, look at this," and then flipped it back.  (Castonguay Dep. I at 184-85.)  During the same visit, Williamson pinched him on the buttocks and made a "hee-ya" sound.  (Id. at 173.)  Castonguay testified that Vestal and Andrews were present when Williamson touched him and that Andrews told Williamson she should not have done that because she was "going to be an administrator soon out in Whiteville." (Id. at 173-74.)  At times when Castonguay and Vestal were working on their knees on the floor, Williamson (on several visits to Liberty Commons in 2009), along with Stephens, repeatedly made comments to the effect of "I like men on their

---

[5] Vestal's deposition is located at Docs. 43-19 and 46-14 and will be referred to as "Vestal Dep."

[6] Contrary to Castonguay's testimony, Vestal testified that Andrews was not present in Stephens' office when he was called in to view the picture.  (Vestal Dep. at 77.)  However, Leslie testified that Andrews was in the room.  (Leslie Dep. at 156.)  For purposes of the present motions, the court credits Castonguay's account.

knees." (Id. at 167, 171–72, 174–76, 181–82, 185–88.) Castonguay ascribed a sexual motive to Williamson's comments because she had previously pinched him on the buttocks, but he concedes that she never "propositioned" him for any sexual encounters. (Id. at 174–75.)[7]

According to Castonguay, the harassment escalated to the point that Stephens inappropriately touched him twice in January 2010. (Castonguay Dep. II at 232.) The first incident occurred in a copy room; according to Castonguay, Stephens entered the room and "grabbed ahold of [him] on [his] buttocks." (Id.) Andrews witnessed the touching and told Stephens that she should not have done that because she is married. (Id.) Later in the month, Castonguay was walking down a hallway when Stephens grabbed him on the buttocks and exclaimed "hoo hoo." (Id. at 235.) Leslie testified that she witnessed the second incident and testified that Stephens "smacked" Castonguay and made a "little noise" as she did it. (Leslie Dep. at 152.)[8] At some point after the second incident, either in late January or early February, Castonguay went to Andrews and told her that if the

---

[7] Vestal testified that Stephens made a similar comment while he was on his knees and Castonguay was not, that he heard it only once, and that he took it as a compliment. (Vestal Dep. at 61–62, 80.)

[8] Castonguay testified that he was not sure whether Leslie was present when Stephens touched him the second time and that he does not remember discussing the event with Leslie. (Castonguay Dep. II at 94–98.)

conduct did not stop, he was going to go over her head and "refer it to corporate." (Castonguay Dep. II at 237–38.)

## C. The Performance Action Plan and Castonguay's Termination

On February 16, 2010, some weeks after Castonguay's late-January or early-February meeting with Andrews, Andrews placed Castonguay on a Performance Action Plan ("PAP"). (Andrews Dep. at 54; Doc. 46–5.) The PAP described four specific performance issues that led to its implementation. See infra Part II.B.1.d. Among other things, it required Castonguay to report to Andrews upon completion of each project, to be available and exhibit concern for the building, to maintain the safety of the facility during weather emergencies, and to treat all fellow staff members with courtesy and respect. (Doc. 46–5 at 3.)

On March 3, 2010, an unexpected snowstorm struck the area. (Castonguay Dep. II at 283-84; Andrews Dep. at 132.) Unaware that it had snowed in the early morning hours, Castonguay arrived at work at his normal time of 8:00 a.m. (Castonguay Dep. II at 283.) He testified that he was not notified that a snow emergency existed and was unaware of it until he awoke that morning. (Id. at 284.) Castonguay submits that he had no duty to report to work until he was called or he had actual notice of

the weather conditions.[9] (Id.) He described the conditions at Liberty Commons upon his arrival as "lots of snow, lots of ice." (Castonguay Dep. II at 283.) Upon arrival, he immediately began shoveling the back entranceway, although other Liberty Commons employees had already been shoveling snow before he arrived. (Id. at 283-84.) He soon encountered fellow employee Vickie Pimkin, who was responsible for transporting patients to and from medical appointments in the facility's van. (Id. at 284; Andrews Dep. at 136.) Pimkin asked Castonguay whether he would accompany her on the route because the road conditions were dangerous.[10] (Pimkin Dep. at 17.)[11] Castonguay then asked Pimkin to run the idea by Andrews. (Castonguay Dep. II at 285.) When Pimkin returned, she told Castonguay that Andrews wanted him to drive the van. (Pimkin Dep. at 17.)[12] According to Andrews,

---

[9] Andrews testified that Castonguay had a duty to determine if the weather conditions would necessitate his early arrival to the facility. (Andrews Dep. at 132-34.)

[10] Castonguay testified that Pimkin had contacted Coates Transportation, a company which Liberty Commons occasionally employed to drive the van. (Castonguay Dep. II at 288.) Coates informed her that it was not operating any vehicles due to the weather conditions. (Id.)

[11] Pimkin's deposition is located at Doc. 43-23 and will be referred to as "Pimkin Dep."

[12] A few weeks earlier, Pimkin had driven the van into a ditch while transporting patients and Castonguay had responded to the scene to help pull it out. (Castonguay Dep. II at 281–82.)

Pimkin and Castonguay were the only employees on staff who could drive the van. (Andrews Dep. at 144.)

Upon hearing that Andrews wanted him to drive the van, Castonguay went to see Andrews. (Castonguay Dep. II at 286.) He told her that he would drive the van as long as she would take responsibility in the event that something happened. (Id.) Because he was subject to the PAP, he was worried that if anything happened to the patients in the van while he was driving, he was certain to be fired. (Id.) Additionally, he worried that the van was "top-heavy" and he lacked the necessary training to drive it in the adverse weather conditions. (Id. at 287, 290.) Castonguay says he never outright refused to drive the van, but he concedes he conditioned his driving on Andrews' acceptance of responsibility. (Id. at 286–92.) In response to Castonguay's conditional acceptance, Andrews simply walked away. (Id. at 292.) Ten to fifteen minutes later, Andrews paged Castonguay to her office and terminated him. (Id.) Castonguay maintains that he did not threaten Andrews or use profanity when he was terminated. (Id. at 291–92; Castonguay Decl. ¶ 123.) Andrews' contemporaneous written account of the morning's events generally supports this account.[13] As a result of Castonguay's

---

[13] One exception is that Andrews' notes reflect that she felt threatened when Castonguay raised his voice and said that Liberty Commons was not going to keep unemployment benefits from him. (Doc. 43-15 at 2.) Andrews testified that Castonguay was "irate" when he

response and termination, Andrews drove the van on March 3. (Castonguay Dep. II at 293.)

### D. Post-Termination Events

On March 8, 2010, Castonguay applied for unemployment benefits with the North Carolina Department of Employment Security ("DES"). (Doc. 43-16 at 2.) Castonguay told DES that he was terminated because he would not drive the van unless Andrews took responsibility for his actions. (Id.) There was no mention on his application of any sexual harassment allegation. On May 27, 2010, Castonguay filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), stating that Andrews did not provide a reason for discharging him. (Doc. 43-17 at 5.) He stated: "I believe I have been discriminated against because of my sex, male, and in retaliation for complaining of a protected activity, in violation of Title VII of the Civil Rights Act of 1964, as amended." (Id.) His amended EEOC charge, filed on February 3, 2011, alleged sexual harassment beginning in June 2009. (Doc. 43-18 at 2.)

After the EEOC dismissed Castonguay's charge, it issued a right-to-sue letter on April 27, 2011. (Doc. 4-1.) Castonguay

---

came to her office the second time and that he refused to drive the van unless she took responsibility for any mistakes he might make. (Andrews Dep. 138.)

subsequently initiated this suit in the Superior Court for Lee County, North Carolina, on July 19, 2011, and Defendants timely removed it to this court. (Docs. 1, 4.) On July 31, 2012, this court dismissed some of Castonguay's claims against Defendants. (Doc. 22.) The remaining claims against the corporate Defendants are for sex discrimination, hostile work environment, and retaliation in violation of Title VII; IIED; and NIED. The remaining claims against Andrews are for IIED and NIED; against Stephens, only the IIED claim survived the motion to dismiss.

Defendants now move for summary judgment on the remaining claims. (Docs. 42, 44.) Castonguay opposes the motions (Docs. 46, 47), and Defendants have filed replies (Docs. 48, 49). The motions are now ripe for decision.

## II. ANALYSIS

### A. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine dispute of material fact remains. Where, as here, the non-moving party has the burden of proof, the moving party is entitled to summary judgment if it shows the absence of material disputed facts. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 325 (1986). For the purposes of these

motions, the court regards statements of the non-moving party as true and draws all inferences in the non-moving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). But a non-moving party must establish more than the "mere existence of a scintilla of evidence" to support his position. Id. at 252. If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50. Ultimately, summary judgment is appropriate where the non-movant fails to offer "evidence on which the jury could reasonably find for the plaintiff." Id. at 252. "As the Supreme Court has made clear, 'courts should [not] treat discrimination differently from other ultimate questions of fact.'" Merritt v. Old Dominion Freight Line, Inc., 601 F.3d 289, 294-95 (4th Cir. 2010) (quoting U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983)).

**B.  Title VII Claims**

**1.  Retaliation**

A plaintiff may prove unlawful discrimination either by showing direct evidence of retaliation or by utilizing the burden-shifting framework outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Karpel v. Inova Health Sys. Servs., 134 F.3d 1222, 1227-28 (4th Cir. 1998). Direct evidence is evidence from which no inference is required, such as a decisionmaker's statement that she retaliated because of the

plaintiff's gender. See Holley v. N.C. Dep't of Admin., 846 F. Supp. 2d 416, 427 (E.D.N.C. 2012) (citing Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 286-91 (4th Cir. 2004) (en banc)). Castonguay has not provided any such evidence in this case.

In order to establish a *prima facie* retaliation claim under the burden-shifting approach, therefore, Castonguay must prove by preponderance of the evidence that (1) he engaged in a protected activity, (2) his employer took an adverse employment action against him that a reasonable employee would find materially adverse, and (3) there was a causal link between the two events. Balas v. Huntington Ingalls Indus., Inc., 711 F.3d 401, 410 (4th Cir. 2013). If Castonguay satisfies this initial burden, the corporate Defendants are then "obliged to articulate a legitimate, non-retaliatory justification" for the action. EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 405 (4th Cir. 2005). If the corporate Defendants satisfy this burden of production, Castonguay then must, by preponderance of the evidence, "demonstrate that the non-retaliatory reason advanced by [the corporate Defendants] is a mere pretext." Id.; Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981). At all times, Castonguay retains the ultimate burden of persuasion to show that the corporate Defendants unlawfully retaliated

against him.  See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 508 (1993).

The corporate Defendants principally argue that Castonguay cannot establish but-for causation as required by the Supreme Court's recent decision in University of Texas Southwestern Medical Center v. Nassar, 133 S. Ct. 2517 (2013).  They concede that Castonguay suffered an adverse employment action when he was terminated and do not seriously contest whether he engaged in protected activity by complaining to Andrews about the alleged harassment.[14]

### a.    The PAP as adverse employment action

While it is clear that Castonguay's termination qualifies as an adverse employment action, Castonguay also asserts that his placement on the PAP qualifies as such.  In the context of a retaliation claim under Title VII, an adverse employment action "is not limited to discriminatory actions that affect the terms and conditions of employment."  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 64 (2006).  Instead, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or

---

[14] Andrews denies most of Castonguay's testimony regarding the alleged harassment.  (Andrews Dep. at 16-24.)  However, at the summary judgment stage the court accepts Castonguay's testimony as true.

supporting a charge of discrimination.'" Id. (quoting Rochon v. Gonzales, 538 F.3d 1211, 1219 (D.C. Cir. 2006) (internal quotation marks omitted)). Whether an action was materially adverse is determined by examining the totality of the circumstances. See id. at 71 (citing Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998)).

Probationary periods may, depending on the circumstances, qualify as materially adverse actions under Burlington. See Harper v. C.R. England, Inc., 687 F.3d 297, 306–07 n.31 (7th Cir. 2012); Leatherwood v. Anna's Linens Co., 384 F. App'x 853, 858 (11th Cir. 2010); Workneh v. Pall Corp., 897 F. Supp. 2d 121, 134–35 (E.D.N.Y. 2012); Cooper v. City of N. Myrtle Beach, Civ. A. No. 4:10-cv-1676, 2012 WL 1283498, at *7 & n.6 (D.S.C. Jan. 25, 2012), adopted by 2012 WL 1283004 (D.S.C. Apr. 16, 2012). The relevant question is whether instituting the PAP would have dissuaded a reasonable employee from continuing to make allegations of sexual harassment to Andrews. Considering the circumstances in this case – including Castonguay's good performance evaluations in both 2008 and 2009, the PAP's placement of Castonguay on a daily monitoring system with Andrews and warning that failure to improve might result in termination, and its institution only two to three weeks after Castonguay threatened Andrews he would go "to corporate" – a reasonable employee could have viewed the PAP as a method of

dissuading further reporting. Thus, the court construes the issuance of the PAP as an adverse employment action for the purposes of Castonguay's retaliation claim.

### b. Causal link

The third element of Castonguay's *prima facie* case is evidence of a causal link between the protected activity and the alleged retaliation. In <u>Nassar</u>, the Supreme Court held that "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." 133 S. Ct. at 2528.[15] In so holding, the Court rejected the plaintiff's argument that the desire to retaliate need only be a "motivating factor" in the employer's adverse decision. <u>See</u> <u>id.</u> at 2528-30; <u>cf.</u> 42 U.S.C. § 2000e-2(m).

<u>Nassar</u> makes Castonguay's task more difficult in this case. The but-for standard "requires the plaintiff to show that the harm would not have occurred in the absence of — that is, but for — the defendant's conduct." <u>Nassar</u>, 133 S. Ct. at 2525 (internal quotation marks omitted). The corporate Defendants argue that <u>Nassar</u>'s heightened causation requirement applies at

---

[15] The text of § 2000e-3(a) provides, in relevant part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

the *prima facie* stage and that, because Castonguay cannot meet it, it is unnecessary to engage in any pretext analysis. Castonguay contends that the temporal proximity between his complaint to Andrews and his termination, along with other circumstantial evidence, satisfies his burden.

Nassar did not address the issue of temporal proximity, and the Fourth Circuit has not addressed it since.[16] But the court

---

[16] Before Nassar, the Fourth Circuit adhered to the view that a close temporal proximity between protected activity and an adverse employment action was sufficient to establish *prima facie* causation. See King v. Rumsfeld, 328 F.3d 145, 151 & n.5 (4th Cir. 2003) (termination two months and two weeks after protected activity sufficient to satisfy *prima facie* causation requirement); Hoyle v. Freightliner, LLC, 650 F.3d 321, 327-28, 337 (4th Cir. 2011) (reassignment and then termination within two months of reporting harassment sufficient). Since Nassar, other Circuits have held that in many cases a plaintiff still may establish the causation element of a *prima facie* retaliation claim based on temporal proximity alone if such proximity is sufficiently close. See, e.g., Feist v. La. Dep't of Justice, Office of the Atty. Gen., 730 F.3d 450, 454 (5th Cir. 2013); Lobato v. N.M. Env't Dep't, 733 F.3d 1283, 1293 (10th Cir. 2013); Ramirez v. Bausch & Lomb, Inc., 546 F. App'x 829, 832-33 & n.2 (11th Cir. 2013) (noting that "the Court did not clarify the role of 'but for' causation in a plaintiff's *prima facie* case"). The Seventh Circuit requires a "convincing mosaic" of circumstantial evidence, in which "suspicious timing . . . rarely is sufficient in isolation to support a case of illegal . . . retaliation." Hobgood v. Ill. Gaming Bd., 731 F.3d 635, 643-44 (7th Cir. 2013). Some district courts in this circuit have continued to consider suspicious timing enough to satisfy the *prima facie* causation requirement. See, e.g., Taylor v. Republic Servs., Inc., 968 F. Supp. 2d 768, 798 (E.D. Va. 2013) (a plaintiff can satisfy Nassar at the *prima facie* stage "if she can prove a 'close temporal proximity' between the time the Company learned about her protected activity and her discharge" (quoting Clark Cnty. Sch. Dist. v. Breeden, 522 U.S. 268, 273 (2001)); Howard v. Allen Univ., Civ. A. No. 3:11-2214-MBS, 2014 WL 66646, at *13 (D.S.C. Jan. 8, 2014); see also Huggins v. N.C. Dep't of Admin., No. 5:10-CV-414-FL, 2013 WL 5201033, at *25 (E.D.N.C. Sept. 13, 2013) (granting the employer's motion to dismiss where the temporal proximity was "very close" (eight days), but the plaintiff failed to allege that her supervisor was aware of her protected activity at the time adverse

need not resolve where in the burden-shifting approach the "but-for" test applies and how the temporal proximity fits into that analysis, because even assuming Castonguay has stated a *prima facie* case, the corporate Defendants have articulated legitimate non-discriminatory reasons for their actions and Castonguay cannot establish sufficient evidence of "but-for" causation even at the pretext stage.

### c. Legitimate non-retaliatory reason

Assuming a *prima facie* case has been demonstrated, the burden shifts to a defendant to "'clearly set forth, through the introduction of admissible evidence,' reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful [retaliation] was not the cause of the employment action." Hicks, 509 U.S. at 507 (quoting Burdine, 450 U.S. at 254–55 & n.8) (emphasis omitted). The corporate Defendants easily satisfy their burden of production and rebut the

---

action was taken). Other courts have indicated that Nassar's but-for standard applies only at the pretext stage. See, e.g., Dall v. St. Catherine of Siena Med. Ctr., 966 F. Supp. 2d 167, 195–96 (E.D.N.Y. 2013) ("[D]uring the final stage of the burden shifting framework, the plaintiff must show that retaliation was a but-for cause of the adverse employment action."); Brooks v. D.C. 9 Painters Union, No. 10 Civ. 7800, 2013 WL 3328044, at *4 (S.D.N.Y. July 2, 2013) (concluding that a plaintiff need not show but-for causation until the employer satisfies its burden of producing a legitimate, non-retaliatory reason for the adverse employment action); but see Mallik v. Sebelius, 964 F. Supp. 2d 531, 550–51 (D. Md. 2013) (concluding that the plaintiff had not established a *prima facie* case of retaliation because he "has not shown that [the defendant's] alleged adverse actions were taken only for purposes of retaliating against [him] for filing an EEOC complaint").

presumption of retaliation. They have proffered evidence that Castonguay was terminated because he failed to report to work early on March 3 to clear snow (Andrews Dep. at 132-34) and then was insubordinate when he told Andrews that he would not drive the van unless she would take responsibility for his actions. Additionally, Andrews testified that she observed Castonguay's work performance deteriorate in the weeks before she placed him on the PAP. (Id. at 122-24.) This evidence is sufficient to rebut the presumption of retaliation regarding both the PAP and the termination.

### d. Pretext

At this point, the burden-shifting framework drops out of the equation, and Castonguay must prove by a preponderance of the evidence that the corporate Defendants' proffered non-retaliatory reasons were in fact pretext for unlawful retaliation. Navy Fed. Credit Union, 424 F.3d at 405. To establish evidence of pretext, an employee must focus on the specific reasons advanced by the employer, rather than establishing his own criteria on which he should have been judged. See Hux v. City of Newport News, 451 F.3d 311, 315 (4th Cir. 2006) ("Once an employer has provided a non-discriminatory explanation for its decision, the plaintiff cannot seek to expose that rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's

validity, or by raising points that are wholly irrelevant to it."); Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 269 (4th Cir. 2005). "More specifically, [Castonguay] can prove pretext by showing that the explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of retaliation." Price v. Thompson, 380 F.3d 209, 212 (4th Cir. 2004) (internal quotation marks and brackets omitted). Of course, "the trier of fact may still consider the evidence establishing [Castonguay's] *prima facie* case 'and inferences properly drawn therefrom . . . on the issue of whether the [corporate Defendants'] explanation is pretextual.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000) (quoting Burdine, 450 U.S. at 255 n.10). Even if Castonguay can show evidence that the proffered reasons for his employer's action were false, the issue ultimately remains whether he has provided sufficient evidence that they were pretexts for unlawful retaliation – under a "but-for" standard – as the real reason for the action. See Hicks, 509 U.S. at 515-16; Nassar, 133 S. Ct. at 2528. The court must remain mindful that "Title VII is not a vehicle for substituting the judgment of a court for that of the employer." Jiminez v. Mary Washington Coll., 57 F.3d 369, 377 (4th Cir. 1995). The court's review is therefore limited to whether the complained of actions were retaliation for Castonguay's alleged complaints to

Andrews.  See id. (citing Smith v. Univ. of N.C., 632 F.3d 316,
346 (4th Cir. 1980)).

Castonguay argues that Andrews' retaliatory animus was the
but-for cause of both the PAP and his eventual termination.  He
relies on the temporal proximity between his complaint to
Andrews and the issuance of the PAP, as well as maintenance
inspection records and work orders (Docs. 47-1, 47-2, 47-3) that
he claims show that he was completing his work in a satisfactory
manner.  The corporate Defendants contend he was terminated as a
result of "his insubordinate behavior on March 3, 2010, his
violation of the PAP, and his blatant disregard for [Liberty
Commons'] established policies and procedures."  (Doc. 45 at
14.)  In addition to evidence regarding Castonguay's conduct on
March 3, they point to Castonguay's DES application for
unemployment benefits, filed five days after his termination.
The application is devoid of any mention of any alleged sexual
harassment and states that he was terminated because he told
Andrews that he would not drive the van if she did not take
responsibility for his actions.  (Doc. 43-16 at 2.)  Not until
his amended EEOC charge filed some 11 months after his
termination, the corporate Defendants note, did Castonguay first
detail his sexual harassment allegations.  (Doc. 43-18 at 2.)

Turning to the termination claim first, the court finds
that the evidence in this case is such that no reasonable juror

could conclude that, but for Castonguay's sexual harassment complaint, he would not have been terminated. The conduct on March 3 alone was sufficient for a reasonable employer to terminate Castonguay, even if he had not been subject to a PAP. Although Castonguay disputes whether he had an independent duty to report to work early that morning in the absence of a call, it is undisputed that he conditioned compliance with Andrews' instruction to drive the van on her taking responsibility for his actions, thus effectively refusing unless she consented.[17] Driving the van was clearly part of Castonguay's job responsibilities. (Castonguay Decl. ¶ 131.) Any reasonable employer could regard his conduct as an act of insubordination. See Black's Law Dictionary 870 (9th ed. 2009) (defining insubordination as "[a] willful disregard of an employer's instructions" or "[a]n act of disobedience to proper authority"); cf. Haulbrook v. Michelin N. Am., 252 F.3d 696, 706–07 (4th Cir. 2001) (discussing insubordination as a legitimate reason for termination). His actions therefore preclude a finding of but-for causation as to his termination. See Gordon v. Napolitano, 863 F. Supp. 2d 541, 548-49 (E.D. Va. 2012) (citing Baqir v. Principi, 434 F.3d 733, 744-45 (4th Cir.

_____

[17] Castonguay contends he was never given a reason for his termination, apparently asserting that his insubordination was merely a *post hoc* justification for retaliatory discharge. This contention is belied by Castonguay's own application for unemployment benefits filed just five days after his termination. (Doc. 43-16 at 2.)

2006) (no but-for causation where evidence shows that the plaintiff would have been terminated even in the absence of discrimination)).

As for the PAP, Castonguay contends that Andrews placed him on it in retaliation for his complaint about Stephens' and Williamson's sexual harassment and his warning that if it did not stop, he would report the harassment "to corporate." (Doc. 47 at 9.) For support, he cites Andrews' testimony that she never reviewed his work orders and never looked at the volume of work orders and maintenance inspections that he performed in the previous month. (Andrews Dep. at 122-23, 170.) Castonguay contends that the majority of the performance issues listed in the PAP involved assignments given to him after he complained to Andrews, and that most of them had been completed before the PAP was issued. (Castonguay Decl. ¶¶ 60-61.) He points to Andrews' acknowledgement that she did not know where the reference to a PAP was located in the employee handbook, although she has placed at least one other employee on a PAP since Castonguay was terminated. (Andrews Dep. at 55, 129.) Additionally, it is undisputed that Castonguay received good performance evaluations in both 2008 and 2009.[18] Because of this, he contends that the

---

[18] See Doc. 46-4 (scoring Castonguay's performance as a 93 out of 100 on February 26, 2008) and Doc. 46-3 (scoring Castonguay's performance as a 93.5 out of 100 on June 30, 2009). Both performance evaluations recommended Castonguay for a three percent merit raise.

PAP was intended to fabricate a reason to terminate him. (Castonguay Decl. ¶ 54.)

The PAP provided several grounds for its institution: (1) "Failure to proactively troubleshoot and prevent further problems," noting that a bucket left to catch water from a water heater on February 12, 2010, overflowed all weekend, and that hot water was running in the toilets; (2) "Failure to initiate projects throughout [the] building," noting the need to clean the storage building and to initiate painting projects; (3) "Leaving storage items in [the] hallway," noting the presence of mattresses and recliners in the employee hallway, and a maintenance cart left at the end of a hall on February 11, 2010; and (4) "Poor Time Management," noting that Castonguay sat in on a residents' activity for nearly two hours on February 12, 2010. (Doc. 46-5 at 2.) The PAP required, among other things, that Castonguay prioritize work orders, report to Andrews as to their progress weekly, refrain from participating in resident activities unless directed to do so, "[e]xhibit concern and availability for the building and maintain[] safety during all types of weather and any unusual situation," and treat fellow staff members with courtesy and respect while following up on their maintenance concerns. (Id. at 3.)

Castonguay contends that he eventually performed the PAP's specifically-listed items by the PAP's date. (Castonguay Decl.

¶ 60-61.) Specifically, he maintains that he monitored the water heater problem over the weekend in question, had previously informed Andrews of the problem, and was delayed a week or so while she made a decision on a replacement unit. (Castonguay Dep. I at 126, 129-36.) He also claims that he tried to clean out the storage unit but had to wait on other employees who had items in the building to decide what to do with them. (Castonguay Dep. II at 147-48, 255.) He further denies that he sat in on the residents' activity for two hours, claiming that it was "[p]robably 15 minutes" and that Andrews was there, too. (Id. at 149.)

Andrews testified that she was frustrated by employee reports (by employees in both the facility's dietary and rehabilitation sections) of Castonguay's deteriorating attitude exemplified by his not wanting to respond to their maintenance requests, and by his failure to be proactive in identifying and fixing maintenance problems. (Andrews Dep. at 121-24.) She did not review his work orders because her concern was not whether the items listed as examples in the PAP were eventually completed, but rather Castonguay's delay and lack of initiative in getting them done, which she observed personally. (E.g., id. at 73-75, 91, 122-24.) For example, she noted that Castonguay's claim that he was waiting for feedback from other employees in order to clean the storage building missed the point: the bulk

of the mess in the building was the mattresses, wheelchairs, big chairs, and other large items which Castonguay was responsible for placing there and which he failed to straighten up and organize. (Id. at 78-84.) His failure made it difficult for others to use the building. (Id. at 81.) She also noted it was his responsibility to keep the facility's hallways clear of furniture, such as mattresses, recliners, and his maintenance cart, which she observed. (Id. at 96, 101-05.) Castonguay's testimony that he was "always painting," (Castonguay Dep. II at 147) similarly misses Andrews' expressed complaint that he failed to do the painting without her having to direct him to do so (Andrews Dep. at 94-95). As to the hot water in the toilets, Castonguay admitted in his deposition that he told the repairman that the problem had "been like this here since day one" (Castonguay Dep. II at 265) – which does not effectively challenge, but supports, the PAP's complaint that Castonguay did not proactively address maintenance issues unless directed by Andrews. As to the PAP's reference to poor time management, Andrews noted that Castonguay's response claiming he only attended the meeting for "[p]robably 15 minutes" (id. at 149) similarly misses the point: the meeting was an activity *for residents* of the facility, not for employees (Andrews Dep. at 106-08). By sitting in on the residents' activity, Castonguay was avoiding his job duties. (Id.) Finally, the corporate

Defendants note that Castonguay conceded in his deposition that the warning to exhibit more concern and availability during weather conditions was a reference to a recent snow event prior to the PAP. (Castonguay Dep. II at 151-52.)

While this is, perhaps, a closer question than the termination, the court concludes that the few fact issues Castonguay has created leave many of Andrews' complaints unchallenged and, even in light of the temporal proximity, the evidence fails as a forecast that rises to the level of showing that retaliation was the real reason for the PAP's institution. In other words, Castonguay fails to demonstrate that a reasonable jury could conclude that the PAP would not have been imposed but for his having allegedly complained to Andrews some two to three weeks before.[19] Accordingly, the corporate Defendants' motion for summary judgment on the retaliation claim will be granted.

### 2. Hostile work environment claim

To survive summary judgment on his hostile work environment claim against the corporate Defendants, Castonguay must produce sufficient evidence for a reasonable jury to find that the

---

[19] The fact that Pimkin was not terminated after she asked Castonguay to accompany her is no help to Castonguay. Pimkin had driven the van into a ditch just weeks before. Andrews appears to have asked Castonguay, the only other qualified driver on staff, to drive the van in an attempt to avoid another accident. Andrews then terminated Castonguay because he refused her instruction as her subordinate, which required that she then drive the van.

conduct was (1) unwelcome; (2) based on his sex; (3) "sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive work environment"; and (4) imputable to Liberty Commons. EEOC v. Fairbrook Med. Clinic, PA, 609 F.3d 320, 327 (4th Cir. 2010).

There is no legitimate dispute that the conduct was unwelcome. It is also clear that the harassment, which was of an obviously sexual nature, was based on Castonguay's sex. The parties dispute whether the conduct constitutes sufficiently severe or pervasive harassment to be actionable under Title VII and is otherwise imputable to Liberty Commons.

Whether the alleged conduct was sufficiently "severe or pervasive" to create a hostile work environment claim depends on the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993); see also Williams v. Aluminum Co. of Am., 457 F. Supp. 2d 596, 608 (M.D.N.C. 2006). To create a cause of action under Title VII, the harassment must be both subjectively and objectively hostile. Harris, 510 U.S. at 21–22. An objectively hostile work environment is one "that a reasonable person would find hostile or abusive." Id. at 21.

"Whether the harassment is objectively severe or pervasive is judged from the perspective of a reasonable person in the plaintiff's position." Williams, 457 F. Supp. 2d at 608 (citing Oncale, 523 U.S. at 81).

Title VII was not intended to create a general workplace civility code. See Jennings v. Univ. of N.C., 482 F.3d 686, 717 (4th Cir. 2007) (citing Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)). As such, it "does not provide a remedy for every instance of verbal or physical harassment in the workplace." Murray v. City of Winston-Salem, 203 F. Supp. 2d 493, 499 (M.D.N.C. 2002) (quoting Lissau v. S. Food Serv., Inc., 159 F.3d 177, 183 (4th Cir. 1998)). "[P]laintiffs must clear a high bar to satisfy the severe or pervasive test." EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 315 (4th Cir. 2008). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Id. (quoting Faragher, 524 U.S. at 788). On summary judgment, the court must "identify situations that a reasonable jury might find to be so out of the ordinary as to meet the severe or pervasive criterion." Id.

According to Castonguay's testimony, there were nine unwelcome incidents between late-spring 2009 and his final complaint to Andrews in 2010: (1) Stephens' spring 2009 inquiry

about Castonguay's girlfriend's breast size; (2) Stephens' "69 Echo Lane" comment to Andrews; (3) the late summer 2009 showing of four bare-breasted women on Stephens' computer screen; (4) Stephens' June 2009 request that Castonguay look at Andrews' buttocks; (5) Stephens' and Williamson's comments that Castonguay looked good in jeans and (while he was working on his knees) that they liked men on their knees; (6) the summer 2009 dummy incident with Williamson; (7) Williamson's summer 2009 buttocks touching incident; (8) Stephens' first buttocks touching incident in the copy room in January 2010; and (9) Stephens' second buttocks touching incident in the hallway. When pressed, Castonguay was unwilling to commit to the frequency of the comments by Stephens and Williamson. (Castonguay Dep. II at 230-31.) He testified: "I don't know the exact number. I mean, it just continuously always happened." (Id. at 231.)

To be sure, the conduct was at times boorish, juvenile, and rude. But there is no evidence that Castonguay was unable to perform his job duties because of the harassment or was ever "propositioned" by anyone. Accepting the conduct in the light most favorable to Castonguay, it does not suggest a working environment that was "pervaded with discriminatory conduct 'aimed to humiliate, ridicule, or intimidate,' thereby creating

an abusive atmosphere." *Sunbelt Rentals*, 521 F.3d at 316
(quoting *Jennings*, 482 F.3d at 695).

The three touching incidents are more troubling than the
other conduct, but they were isolated and minor. In the light
most favorable to Castonguay, they amount at most to slight
touchings on his clothed buttocks. Castonguay cites no
authority for finding that such conduct satisfies the "severe or
pervasive" inquiry; his brief consists of conclusory statements
to the effect that the conduct was objectively severe and
especially offensive to men. (Doc. 46 at 14.)

It is true that the presence of touching incidents is
sometimes sufficient for a plaintiff to survive summary judgment
on a hostile work environment claim because they often increase
the severity of the situation. Those cases, however, involve
conduct more severe or more pervasive than what occurred in this
case. *See, e.g.*, *Anderson v. G.D.C., Inc.*, 281 F.3d 452, 456,
459 (4th Cir. 2002) (denial of summary judgment proper where the
plaintiff was subject to daily vulgar insults based on her race
and sex, and on one occasion the defendant pressed his penis
into her buttocks); *Worth v. Tyer*, 276 F.3d 249, 268 (7th Cir.
2001) (holding summary judgment to the employer improper where
one of several touching incidents was a supervisor touching the
employee's breast for several seconds); *Harvill v. Westward
Commm'cns, L.L.C.*, 433 F.3d 428, 435-36 (5th Cir. 2005) (holding

summary judgment improper where the employee testified that her supervisor fondled her breasts and patted her on her buttocks "numerous times" and came up behind her and rubbed his body against her).   As this court has recognized, many courts have found isolated touching incidents insufficient to satisfy the "severe or pervasive" test.   See Brown v. Henderson, 155 F. Supp. 2d 502, 508 (M.D.N.C. 2000) (citing Saxton v. Am. Tel. & Tel. Co., 10 F.3d 526, 534 (7th Cir. 1993)); see also Hopkins v. Balt. Gas & Elec. Co., 77 F.3d 745, 747, 753 (4th Cir. 1996) (conduct, occurring over a period of several years, including a kiss on the mouth and holding a magnifying glass over the employee's genitals was insufficient to state a hostile work environment claim); LeGrand v. Area Res. for Cmty. & Human Servs., 394 F.3d 1098, 1102 (8th Cir. 2005) (summary judgment to employer affirmed in male-on-male harassment case where supervisor kissed the plaintiff on the mouth, grabbed his buttocks, and reached for his genitals, among several verbal incidents); Brooks v. City of San Mateo, 229 F.3d 917, 921, 926-27 (9th Cir. 2000) (collecting cases and determining that a single incident where the plaintiff's supervisor forced his hand under the plaintiff's shirt and fondled her breast for a few seconds insufficient to establish a hostile work environment claim).

These cases demonstrate "that the 'line between a merely unpleasant working environment . . . and a hostile or deeply repugnant one' may be difficult to discern." Hopkins, 77 F.3d at 753 (quoting Baskerville v. Culligan Int'l Co., 50 F.3d 428, 431 (7th Cir. 1995)). Because of the isolated and minor nature of the touching incidents and the fact that they were unconnected to any threats or sexual advances, the court finds that, under the totality of the circumstances, the conduct does not clear the "high bar" required in hostile work environment cases. Cf. Hartsell v. Duplex Prods., Inc., 123 F.3d 766, 773 (4th Cir. 1997) (summary judgment appropriate on hostile work environment claim where co-workers told the plaintiff "[w]e've made every female in this office cry like a baby"; made comments upon seeing a buxom woman in the company magazine; asked another female employee whether she would be a "mini van driving mommy" or "be a salesperson and play with the big boys"; and told the plaintiff that she should "go home and fetch [her] husband's slippers like a good little wife"); Freeman v. Dal-Tile Corp., No. 13-1481, _ F.3d _ (4th Cir. Apr. 29, 2014) (summary judgment on hostile work environment claim improper when frequent customer used highly offensive, degrading racial and sexual epithets multiple times per week for three years and regularly displayed pictures of naked women on his phone).

Therefore, the corporate Defendants' motion for summary judgment on the hostile work environment claim will be granted, and the court need not decide whether any such conduct could be imputed to the corporate Defendants.

### 3. Sex discrimination claim

The complaint alleges that Defendants "discriminated against [Castonguay] in the terms, conditions and privileges of employment in various ways, in substantial part [sic] of his sex, in violation of [Title VII]." (Doc. 4 ¶ 43.) Castonguay did not address the corporate Defendants' argument in opposition to this sex discrimination claim in his response brief or at the March 19 hearing. The corporate Defendants are correct that Castonguay has abandoned this claim. Lawley v. Northam, Civ. A. No. ELH-10-1074, 2011 WL 6013279, at *24 (D. Md. Dec. 1, 2011) (citing Mentch v. E. Sav. Bank, FSB, 949 F. Supp. 1236, 1247 (D. Md. 1997)). However, district courts have an obligation to review unopposed dispositive motions to ensure that dismissal is proper. See Stevenson v. City of Seat Pleasant, 743 F.3d 411, 416 n.3 (4th Cir. 2014).

"[T]he elements of a *prima facie* case of discrimination under Title VII are: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." Coleman v. Md. Court of Appeals,

626 F.3d 187, 190 (4th Cir. 2010). The court has carefully reviewed the claim and finds that it lacks merit, particularly because Castonguay has failed to point to any employee outside of the protected class who was treated differently from him. Therefore, the corporate Defendants' motion for summary judgment on the sex discrimination claim will be granted.

### C. Emotional Distress Claims

Following the resolution of Defendants' motions to dismiss, Castonguay retained claims of IIED against all Defendants and NIED against all Defendants except Stephens. The elements of a claim of IIED under North Carolina law are "(1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional distress." Wilkerson v. Duke Univ., 748 S.E.2d 154, 159 (N.C. Ct. App. 2013) (quoting Dickens v. Puryear, 276 S.E.2d 325, 335 (N.C. 1981)). The elements of a claim of NIED are "(1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress . . ., and (3) the conduct did in fact cause the plaintiff severe emotional distress." Id. (quoting Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A., 395 S.E.2d 85, 97 (N.C. 1990)). The third element of both claims requires Castonguay to show that he suffered "severe emotional distress." The level of emotional distress required is the same to establish either claim.

36

<u>Holloway v. Wachovia Bank & Trust Co., N.A.</u>, 452 S.E.2d 233, 243 (N.C. 1994). Whether Castonguay's forecasted evidence may establish severe emotional distress is a question of law for the court. <u>Waddle v. Sparks</u>, 414 S.E.2d 22, 28 (N.C. 1992) (citing Restatement (Second) of Torts § 46 cmt. j (1965)).

Severe emotional distress is "any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so." <u>Wilkerson</u>, 748 S.E.2d at 159 (quoting <u>Johnson</u>, 395 S.E.2d at 97). North Carolina sets a high threshold on this element. "The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it." <u>Waddle</u>, 414 S.E.2d at 27-28 (quoting Restatement (Second) of Torts § 46 cmt. j (1965) (emphasis omitted)).

Here, Castonguay's evidence consists of his testimony that he suffered sleepiness, depression, anxiety, sleepless nights, loss of interest in sexual relations with his girlfriend, and loss of enjoyment in certain hobbies such as woodworking. (Castonguay Dep. II at 179-83.) His girlfriend testified that he became intimidated by women, lost interest in sex, and stopped riding his motorcycle for recreation. (Doc. 46-16 at 3-4.) However, Castonguay admitted that he has never attempted to

contact a physician or psychologist. (Castonguay Dep. I at 279–
80.) This evidence is insufficient to support a conclusion that
Castonguay suffered severe emotional distress. See, e.g.,
Williams v. HomEq Servicing Corp., 646 S.E.2d 381, 385 (N.C. Ct.
App. 2007) (summary judgment to the defendant proper where the
plaintiffs' sole evidence consisted of testimony stating that
they suffered from chronic depression, and they were never
diagnosed by any doctor of any type of severe mental condition);
Johnson v. Scott, 528 S.E.2d 402, 405 (N.C. Ct. App. 2000)
(affirming summary judgment for the defendant where the
plaintiffs stated that they suffered from nightmares, were
afraid of the dark, and had stress-related illnesses, but were
never diagnosed); Fox-Kirk v. Hannon, 542 S.E.2d 346, 356 (N.C.
Ct. App. 2001) (affirming an award of attorney fees against the
plaintiff in a NIED case where the plaintiff had failed to seek
medical treatment for two years after the incident causing
alleged distress); Strickland v. Jewell, 562 F. Supp. 2d 661,
676–77 (M.D.N.C. 2007) (granting summary judgment to the
defendants where the plaintiff alleged suffering "difficulty
sleeping, nightmares, decreased appetite, and generally
increased stress and fatigue," but was never medically diagnosed
with any mental condition); Collins v. Chem. Coatings, Inc., No.
5:07cv116, 2010 WL 1404619, at *7–8 (W.D.N.C. Mar. 31, 2010)
(granting summary judgment for the defendant where the plaintiff

"failed to provide sufficient medical documentation of severe and disabling psychological problems in order to adequately substantiate her claim of emotional distress").[20]   Although Castonguay is correct that he need not provide expert medical testimony to establish severe emotional distress, <u>Coffman v. Roberson</u>, 571 S.E.2d 255, 261 (N.C. Ct. App. 2002), the cases cited demonstrate that the North Carolina courts have found a plaintiff's decision not to seek a medical diagnosis highly probative of the alleged level of distress.   <u>See also</u> <u>Pacheco v. Rogers & Breece, Inc.</u>, 579 S.E.2d 505, 508 (N.C. Ct. App. 2003) ("[A]ppellate decisions have consistently upheld dismissal of NIED and similar claims, where a plaintiff fails to produce any real evidence of severe emotional distress.").

Therefore, Castonguay cannot satisfy the "severe emotional distress" requirement of either an IIED or NIED claim.   Because of this, the court need not decide whether the acts in the record constitute sufficiently "extreme and outrageous" conduct to sustain an IIED claim.   The corporate Defendants' and Andrews' motions for summary judgment on the IIED and NIED

---

[20] Castonguay testified that at least part of the distress he suffered was as a result of having to re-live the events at Liberty Commons during his deposition.  (<u>See</u> Castonguay Dep. II at 22-24.)  Damages suffered as a result of a lawsuit Castonguay voluntarily initiated cannot be claimed as damages for the purposes of NIED or IIED.  In any event, Castonguay's testimony with respect to damages suffered as a result of his deposition would be insufficient to sustain an NIED or IIED claim.

claims will be granted, and Stephens' motion for summary judgment on the IIED claim will be granted.[21]

## III. CONCLUSION

For the reasons set forth above, the court concludes that Castonguay has adduced insufficient evidence for a reasonable jury to find in his favor on any of his remaining claims.

IT IS THEREFORE ORDERED that Defendants' motions for summary judgment (Docs. 42, 44) are GRANTED and the case DISMISSED WITH PREJUDICE.

                                    /s/    Thomas D. Schroeder
                                    United States District Judge

April 30, 2014

---

[21] Castonguay argues that the corporate Defendants would also be liable under a negligent retention theory. Because the court concludes that neither Andrews nor Stephens committed any tortious act, such a claim must fail. See Medlin v. Bass, 398 S.E.2d 460, 462 (N.C. 1990).